# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHAD SAYERS,<br><br>Defendant. | **MEMORANDUM DECISION<br>AND ORDER<br>DENYING DEFENDANT'S MOTION<br>FOR A NEW TRIAL**<br><br>Case No. 2:22-CR-480<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Defendant Chad Sayers moves for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. The court denies the motion.

## I.

Mr. Sayers was charged by indictment with two counts of wire fraud and one count of contempt. He proceeded to trial on these charges.

On April 20, 2023, the fourth day of trial, both parties rested their cases at approximately 10:30 a.m., and the jury retired from the courtroom. *See* Dkt. No. 76 at 28–29 (438:15–439:4). The court then offered the defense an opportunity to present a motion if it wished to do so, ruled on an outstanding legal issue, and discussed logistics with counsel. These matters were concluded at approximately 10:50 a.m., and the court ordered a fifteen-minute recess. *See id*. at 40 (450:15–19). The court anticipated that it would provide the jury final instructions and counsel would present closing arguments when proceedings resumed at 11:05 a.m.

But the trial did not proceed as expected. Shortly after the recess began, Mr. Sayers' trial counsel, Rudy Bautista, ingested hand sanitizer. During the COVID-19 pandemic, court personnel began placing hand sanitizer in the courtroom for the convenience of counsel and the

1

parties. The hand sanitizer bottle placed at counsel's table had a flip-top instead of a pump-top dispenser, and Mr. Bautista mistook it for a water bottle.

After hearing of Mr. Bautista's mishap, the court extended the recess until approximately 11:35 a.m. The court then met with counsel, while the jury remained in the jury room, and Mr. Bautista explained what happened:

> I saw the little bottle, I assumed it was a bottle of water. I was aware that the court stopped putting—and I have a breath mint in, sorry—stopped putting carafes of water because of COVID. In the state courts, they put water bottles. I saw that bottle for the last few days, assumed it was water. In preparation of this morning, instead of going downstairs to buy a bottle of water, I came in the courtroom, I opened it, it unclicked so I knew I was the original opener and I, in essence, chugged it. After realizing that this didn't taste right, I stopped. It looked by my estimate maybe an ounce.

*Id.* at 41 (451:3–14).

Mr. Bautista reported that he "[i]mmediately started salivating, ran out, spat a couple of times, flushed [his] mouth continuously, thought about force vomiting [him]self, kept drinking water," and "[c]alled Poison Control." *Id.* (451:14-17). Poison Control informed Mr. Bautista that the hand sanitizer likely contained 70 percent ethanol alcohol and that drinking it was thus equivalent to drinking 140-proof liquor. *See id.* (451:17–22). Poison Control advised Mr. Bautista not to make himself vomit but instead "just to wait" for his body to metabolize the alcohol. *Id.* (451:22–24).

Mr. Bautista next described his (then) current situation: "I do feel relaxed, so I do feel some form of impairment but it is getting better. And I'm cognizant of what's going on. And again, I have a breath mint so I think that's why I'm slurring." *Id.* at 41–42 (451:25-452:3).

The court asked Mr. Bautista whether it would make sense to recess for lunch to give him additional time to clear his mind and feel better. *See id.* at 42 (452:17–21). Mr. Bautista responded as follows: "Ten minutes ago, I would have agreed with you. Right now, I feel like I

am processing it and getting much better. However, I think in an abundance of caution, especially since it's just after 11:40, it would make sense." *Id*. at 42–43 (452:22–453:1). The court then ordered a recess until 12:30. *See id*. at 43 (453:8–14).

Immediately after the recess, the court asked Mr. Bautista how he was feeling. *See id*. (453:19). He replied, "I feel a little off. However, I don't believe I feel impaired in any way. I believe we're ready to proceed." *Id.* (453:20–22).

After the court and counsel briefly discussed a ruling the court had made shortly before Mr. Bautista ingested the hand sanitizer, the jury returned to the courtroom at 12:45 p.m. *See* Dkt. No. 61. The court then gave the jury final instructions, the Government presented closing argument, Mr. Bautista presented closing argument, and the Government presented rebuttal argument. *See* Dkt. No. 76 at 45–85. The jury retired to deliberate at 1:45 p.m. It thus appears that nearly two-and-a-half hours passed between when Mr. Bautista ingested the hand sanitizer—shortly after the court recessed at approximately 10:50—and when Mr. Bautista presented his closing argument (beginning sometime between 1:15 and 1:30).

Later that afternoon, the jury returned a verdict for the Government, finding Mr. Sayers guilty on all three counts. *See* Dkt. No. 61.

On May 22, 2023, more than a month later, the court received a letter from Mr. Sayers. *See* Dkt. No. 69. Mr. Sayers reported that he had not heard from Mr. Bautista since the trial. *Id.* at 1. Mr. Sayers also raised concerns regarding the hand-sanitizer incident and Mr. Bautista's closing argument. Mr. Sayers represented that Mr. Bautista told him, along with his mother and a friend, "just twenty minutes before we began the closing arguments that he was 'buzzed' and 'dizzy.'" *Id*. at 1–2.

Mr. Sayers also represented that "during his closing argument," Mr. Bautista "did not use the strategy that we had discussed him using," that "[w]hen he finished his closing remarks," Mr. Bautista asked Mr. Sayers "if he had made a specific statement," and that Mr. Bautista told him that he had forgotten to include "a crucial instruction" in his closing argument, "something that he states in EVERY trial." *Id*. at 2. And although Mr. Sayers does not identify what this crucial instruction was, he contends that it "was a very important instruction to the jury that very well might have reversed the verdict had just one juror heard it." *Id.*

New counsel was appointed for Mr. Sayers on July 25, 2023. *See* Dkt. No. 85. On August 18, 2023—25 days later—new counsel moved for a new trial on the ground that Mr. Bautista "was most likely impaired because of drinking the hand sanitizer, and, most certainly was preoccupied with his physical safety during closing arguments instead of focusing on the arguments that needed to be made in Mr. Sayers' trial." Dkt. No. 90 at 3.

## II.

The Government argues that Mr. Sayers' motion for a new trial is time barred. This court agrees. Federal Rule of Criminal Procedure 33(b)(2) requires that "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Although this filing deadline is not jurisdictional, it is a "rigid," "inflexible claim-processing rule." *Eberhart v. United States*, 546 U.S. 12, 13 (2005) (cleaned up). Here, the jury returned a verdict of guilty on April 20, 2023. But Mr. Sayers' motion was not filed until August 18, 2023—more than 100 days late.[1]

---

[1] After the jury returned its verdict, the court purported to set May 5, 2023 as the deadline for post-trial motions, which was fifteen days after the jury returned its verdict, and the parties agreed to this deadline. *See* Dkt. No. 76 at 121 (531:2–21). The court is now uncertain whether it had authority to extend the deadline imposed by Rule 33(b)(2) by one day, even with the parties'

4

To be sure, Mr. Sayers sent his letter to the court raising concerns with Mr. Bautista's closing argument long before the motion for a new trial was filed. *See* Dkt. No. 69. But even that letter was not received by the court until May 22, 2023—more than a month after the jury returned its verdict. And of course that letter did not qualify as a motion in all events.

In his letter, Mr. Sayers also complained that Mr. Bautista had not communicated with him since the trial, and the court ultimately appointed new counsel. Mr. Sayers does not cite—and the court has not found—any authority suggesting that the court may toll the time between the jury's verdict and the appointment of new counsel so as not to penalize Mr. Sayers for Mr. Bautista's failure to communicate with him. But even if the court had authority to relax Rule 33(b)(2)'s "rigid," "inflexible" deadline on this ground, Mr. Sayers' motion would still be untimely. For new counsel did not file this motion until 25 days after they were appointed.

### III.

Even were Mr. Sayers' motion timely, moreover, the court would deny the motion. "Rule 33 of the Federal Rules of Criminal Procedure authorizes district courts to grant new trials 'if required in the interest of justice.'" *United States v. Gwathney*, 465 F.3d 1133, 1143 (10th Cir. 2006). But "[a] motion for a new trial is not regarded with favor and should only be granted with great caution." *United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir. 1997). Although Rule 33 "does not define 'interest of justice,'" *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989), courts have generally concluded "that any error sufficient to require a reversal on appeal is an adequate ground for granting a new trial," *United States v. Thomas*, No. 13-CR-1874, 2016

---

consent. It need not decide this issue, however, because Mr. Sayers' motion was clearly untimely, regardless of whether the deadline was May 4th, as dictated by Rule 33(b)(2), or May 5th, as the court purported to order.

WL 9819560, at *7 (D.N.M. Aug. 5, 2016). Ultimately, "the decision whether to grant a motion for a new trial is committed to the sound discretion of the trial court." *Id*. at *8 (cleaned up).

Mr. Sayers first argues that a new trial is warranted because "Mr. Bautista was most likely impaired during closing arguments." Dkt. No. 90 at 3. But the court concludes that a new trial is not warranted on this ground.

Mr. Bautista did consume approximately one ounce of hand sanitizer that was likely 70 percent ethanol alcohol and thus equivalent to 140-proof liquor. About 45 minutes later, Mr. Bautista reported that he felt like he was "processing" the alcohol and "getting much better." Dkt. No. 76 at 42 (452:23–24). But out of "an abundance of caution" he agreed with the court that "it would make sense" to recess for lunch before resuming the proceedings. *Id*. at 42–43 (452:24–453:1). After lunch—and more than 90 minutes after he ingested the hand sanitizer—Mr. Bautista reported that he felt "a little off" but did not "feel impaired in any way" and believed he was "ready to proceed." *Id*. at 43 (453:20–22). And although the court then resumed the proceedings, Mr. Bautista did not actually present his closing argument until at least 45 minutes later.

Given what had happened, the court and its personnel paid close attention to the presentation and substance of Mr. Bautista's closing argument to ensure that Mr. Sayers' representation was not compromised. As for Mr. Bautista's presentation, neither the court nor its personnel observed any physical signs of impairment or anything else that gave cause for concern during Mr. Bautista's closing argument. His speech was not slurred but sounded as it had throughout the trial, his presentation was articulate, and his arguments were coherent.

Nor did the substance of Mr. Bautista's closing argument raise concerns for the court or its personnel—either at the time of the argument or on further review. Indeed, in response to Mr.

Sayers' motion, the court has carefully reviewed the transcripts of Mr. Bautista's opening statement, his examination of each witness during the four-day trial, and his closing arguments. This review confirmed the court's contemporaneous impression that Mr. Bautista's closing argument carefully recapped the general themes and theories of the case that he had pursued throughout the trial.

For example, a theme introduced in Mr. Bautista's opening statement and developed through his examinations was that Mr. Sayers' "executive marketing summary and . . . pitch deck"—which contained the representations that the Government alleged were fraudulent—"were not supposed to be distributed to any investor" because they were "a work in progress" and "at that point" Mr. Sayers and the individual to whom he sent these materials "were only talking about starting up a new business." Dkt. No. 73 at 29 (29:4–14); *see also* Dkt. 74 at 44–45 (105:20–106:13) (developing this theme during cross-examination). In his closing argument, Mr. Bautista reminded the jury of this, arguing that the pitch deck and marketing summary were a "work in progress" and simply part of the process of "brainstorming" a new business concept. Dkt. No. 76 at 73 (483:10, 19).

Similarly, in his opening statement and examinations, Mr. Bautista emphasized that Mr. Sayers never approached investors with an explicit request for money. In his opening statement, Mr. Bautista represented, "At no time did [Mr. Sayers] ever reach out to any investor and say, 'Give me your money.'" Dkt. No. 73 at 29 (29:20–21). And he carefully developed this argument when examining witnesses, including Ed Crowder, the individual to whom Mr. Sayers sent the pitch deck and executive summary and through whom the Government alleged Mr. Sayers solicited investors. For example, Mr. Bautista asked Mr. Crowder point blank, "Did Mr. Sayers ask you to ask Mr. Verdun to invest?" Dkt. No. 74 at 52 (113:13). Mr. Bautista drove this point

7

home during his closing argument, asserting that "Mr. Crowder didn't send this out to people and say, 'Give me your money'"—because "it never went to a single potential investor." Dkt. No. 76 at 73 (483:21–22), 82 (492:5–6).

To be sure, in his letter to the court, Mr. Sayers represents that Mr. Bautista failed to make "a specific statement" or "crucial instruction" during his closing argument, "something that he states in EVERY trial." Dkt. No. 69 at 2. Mr. Sayers asserts that the omitted argument "was a very important instruction to the jury that very well might have reversed the verdict had just one juror heard it." *Id.*

But Mr. Sayers does not enlighten the court as to what the unfired silver bullet was. And, based on its careful review of the entire trial transcript, the court is at a loss to say what it might have been. Indeed, the court has identified no theme or argument of consequence introduced in Mr. Bautista's opening statement or developed during his examination of witnesses that was omitted from his closing argument—let alone one of such overwhelming and potentially dispositive significance as asserted by Mr. Sayers.

For their part, Mr. Sayers' new counsel do not appear to embrace Mr. Sayers' claim that Mr. Bautista omitted some argument of potentially dispositive significance from his closing argument; certainly, they do not attempt to identify what that argument might have been. Instead, they focus more generally on Mr. Bautista's consumption of the hand sanitizer and likely impairment.

But absent circumstances far more extreme than those presented here, courts have denied motions for new trials and rejected claims of error based on intoxication absent a showing of specific prejudice. In *Hernandez v. Wainwright*, for example, the defendant smelled liquor on his attorney's breath during trial and complained that his attorney was "drunk during two of their

three pre-trial consultations." 634 F. Supp. 241, 245 (S.D. Fla. 1986), *aff'd*, 813 F.2d 409 (11th Cir. 1987) (unpublished table decision). But the court denied petitioner's motion for a new trial because the petitioner had "not shown how this condition caused [his attorney] to render deficient legal representation or how this state resulted in prejudice to Petitioner's case." *Id*.

Similarly, in *Young v. Zant,* the Eleventh Circuit denied relief to a defendant who represented that his attorney "took 'huge grey pills' during the trial and failed to investigate alibi witnesses which he told him about" because the record "fail[ed] to support any claim that [defense counsel's] handling of the trial was affected by his drug usage. [He] presented a vigorous and capable defense." 727 F.2d 1489, 1493 (1984); *see also Berry v. King*, 765 F.2d 451, 454 (5th Cir. 1985) (holding that "under *Strickland* the fact that an attorney used drugs is not, *in and of itself*, relevant to an ineffective assistance claim," and explaining that the "critical inquiry is whether, for whatever reason, counsel's performance was deficient and whether that deficiency prejudiced the defendant").

To be sure, in *Franklin v. State*, the Arkansas Supreme Court sustained a claim of error absent a specific showing of prejudice in a case in which defense counsel was so utterly inebriated that he was a "disgrace to the legal profession" and his presence in the courtroom reduced the trial "to a sham, farce, or mockery of justice." 471 S.W.2d 760, 763 (1971). As the court explained, defense counsel's "hair and clothing [were] disheveled," he "was unexplainedly absent from the courtroom on several occasions while the trial was in progress," and he "often could not be either heard or understood when he talked." *Id.* at 761–62. One juror "said that he actually considered getting up and leaving the courtroom, because he did not feel that a jury should be required to sit on a case where the defendants' attorney appeared, because of intoxication, to be in no state of mind to be handling a case in court." *Id.* at 762. Indeed, defense

9

counsel even offered an Arkansas state trooper a drink from his bottle of wine during a recess before taking one himself. *See id.* Under these extreme circumstances, the court did not require the defendant to point out any specific flaws in defense counsel's representation, instead finding it sufficient to observe that one "cannot be effectively heard through one so drunk that his speech cannot be heard or, at best, is incoherent." *Id.* at 765.

Mr. Bautista's behavior and demeanor, discussed at length earlier, could not have been more different. The court thus rejects Mr. Sayers' argument that the supposed likelihood that Mr. Bautista was impaired at the time of his closing argument justifies a new trial absent any showing of specific prejudice.[2]

Finally, Mr. Sayers argues that "even assuming Mr. Bautista was not impaired at the time he gave his closing arguments," a new trial is warranted because "Mr. Bautista, having called Poison Control," may have been "more focused on his physical safety and what might happen in the next few hours, because of him drinking hand sanitizer, instead of focusing on Mr. Sayers' case—to Mr. Sayers' detriment." Dkt. No. 90 at 5. But such speculation is not a substitute for a specific showing of prejudice. As explained above, Mr. Sayers makes no attempt to make such a showing and, based on its review of the entire trial transcript, the court has been unable to identify any meaningful oversight or deficiency in Mr. Bautista's closing argument. In all events, the record contains no evidence that Mr. Bautista was unduly concerned with his own safety once

---

[2] Although the Arkansas Supreme Court's ultimate holding is thus inapposite here, it did provide relevant guidance for addressing an intoxicated attorney: "a suspension of the trial for a reasonable time to permit counsel to be restored to a condition in which he could properly represent his clients in further steps in the course of the trial." *Id*. at 765. That is precisely what the court sought to do in Mr. Sayers' case.

he was reassured by Poison Control that he was not in danger and simply needed to wait to until his body metabolized the alcohol in the hand sanitizer he had consumed.[3]

\* \* \*

For the foregoing reasons, Defendant's motion for a new trial is **DENIED**.

**IT IS SO ORDERED.**

DATED this 14th day of February, 2024.

_____
Howard C. Nielson, Jr.
United States District Judge

---

[3] Mr. Sayers also argues that Mr. Bautista may have been "concerned or believed that the Court was thinking that he purposefully engaged in this conduct to induce a mistrial" and thus "appeared to want to ensure the Court that was not the case and that he could push forward with the case and closing—even if Mr. Bautista was not ready." Dkt. No. 90 at 5. But Mr. Sayers' current counsel, not having been present at trial, clearly fail to appreciate the light-hearted and joking nature of the exchange between the court and Mr. Bautista that they cite. In all events, the court specifically reassured Mr. Bautista, immediately after this exchange, "And, Mr. Bautista, of course I know that you're not intentionally delaying. Of course I know that." Dkt. No. 76 at 42 (452:14–16).